UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:11-CV-00244-JHM

METROPOLITAN LIFE INSURANCE COMPANY                    PLAINTIFF

V.

WILLIAM WILLOCK, JR., et. al.                          DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant Jann B. Logsdon's Motion for Summary Judgment [DN 16]. Fully briefed, this matter is ripe for decision. For the following reasons, the Court **GRANTS** Defendant Logsdon's motion for summary judgment.

**I. BACKGROUND**

While working for Delta airlines for approximately 37 years, (<u>see</u> Logsdon Aff. ¶ 4, Def.'s Mot. for Summ. J., Ex. 2, Logsdon's Aff., Ex. A, Norton Hosp. Consult. 2), Donna Willock acquired life insurance through Metropolitan Life Insurance Company ("MetLife"). (Compl. ¶ 6.) In 1983, Donna married Defendant William Willock. (Norton Hosp. Consult. 1.) Donna had a son from a previous marriage and had two more children during her marriage to Willock. (Norton Hosp. Consult. 2.)

In 1994, Donna was diagnosed with breast cancer. (Logsdon Aff. ¶ 7.) She made estate plans in 1995 and executed a will and a power-of-attorney ("POA"), naming her husband, Willock, as her attorney-in-fact. (<u>Id.</u>) Donna underwent an experimental treatment program at Duke University in 1995, which helped push her cancer into remission. (<u>Id.</u> at ¶ 8-9.) With her cancer finally in remission in 1999, Donna executed an entirely new estate plan that effectively removed Willock's control of Donna's estate. (<u>Id.</u> at ¶ 9.) Donna executed a new will naming her friend,

Jann B. Logsdon, as Executrix of her estate; a revocable trust, with herself as trustee and Logsdon as successor trustee; an irrevocable life insurance trust naming Logsdon as trustee; and a new POA, naming Logsdon as her attorney-in-fact.  (Id.)  However, the new POA did not expressly revoke the prior POA.  (See Def.'s Mot. for Summ. J., Ex. 15, 1999 Power-of-attorney.)  Furthermore, Donna did not inform Willock of the changes to her estate plans until the summer of 2010.  (Id. at ¶ 13.)

Donna developed a recurrence of metastatic breast cancer in 2008.  (Id. at ¶ 11, Norton Hosp. Consult. 1.)  As her conditioned worsened in 2010, Donna began reviewing her estate planning documents and discovered that the revocable trust had accidentally been designated as the beneficiary of her life insurance, when the irrevocable trust was the proper beneficiary.  (Logsdon Aff. ¶ 12.)  To remedy this, Donna submitted a change of beneficiary form in paper format in July 2010, designating the irrevocable trust as the beneficiary of her life insurance policy.  (Id.)  However, this form contained an improper strike-out and was not accepted by MetLife.  (Id.)  On August 3, 2010, Donna submitted another paper form designating the irrevocable trust as the beneficiary.  (Id. at ¶ 14.)  Although Donna was supposed to receive confirmation of the accepted change from MetLife, she never received that confirmation.  (Id.)  Because she did not receive the confirmation from MetLife, Donna submitted a third change of beneficiary form in paper format on September 5, 2010, again naming the irrevocable trust as the beneficiary.  (Id. at ¶ 15.)  This form was witnessed by Logsdon and Donna's son.  (Id.)

This third change of beneficiary form was executed by Donna while she was a patient at Norton Hospital.  (Id.)  Donna had been hospitalized due to her deteriorating condition on September 3, 2010.  During her initial consultation at the hospital, Donna spoke in detail about the stressors of her home life, where Willock was the primary caregiver.  (Norton. Hosp. Consult. 1.)  Donna

2

complained that she was neglected by Willock and was "fearful for her own health and safety at home." (Id.) Donna attributed this to Willock's alcoholism and recent conflicts between herself and Willock. (Id.) She stated that she was disappointed by Willock's behavior and admitted that it had been ongoing for some time, but that it was worsening of late. (Id.) Donna attributed the increase in neglect and emotional abuse to Willock's discovery that her estate plans had been altered. (Def.'s Mot. for Summ. J., Ex. 2, Logsdon's Aff., Ex. D, Progress Notes dated September 8, 2010.) Donna felt so strongly about her fear and lack of support at home that she requested to be placed in a nursing home once she was discharged from the hospital, rather than return to live at home with Willock. (Norton Hosp. Consult. 1-2.) The physician conducting the consultation went so far as to discuss the initiation of charges through Adult Protective Services ("APS"). (Id. at 2.) APS was eventually called and case number 1515 was assigned to Donna. (Def.'s Mot. for Summ. J., Ex. 2, Logsdon's Aff., Ex. C, Progress Notes dated September 9, 2010.)

After her release from Norton Hospital on September 9, 2010, Donna was admitted to the Golden Living nursing home in Louisville, Kentucky. (Logsdon Aff. ¶ 18.) Willock routinely visited Donna while she was at the nursing home. (Willock Aff. ¶ 19.) During such a visit on September 14, 2010, Donna informed Willock that she wanted to make him the beneficiary of her life insurance policy.[1] (Id. at ¶ 21.) Donna then told Willock to obtain a change of beneficiary form so that she could so designate him. (Id.) While looking for the form on MetLife's website, Willock was reminded that the beneficiary could be changed using an online account that he and Donna had established in December 2009. (Id. at ¶¶ 10, 22.) Rather than print off the paper form, Willock

---

[1] Where disputed facts are at issue, the Court has taken the facts in the light most favorable to the non-movant, Willock.

3

visited Donna the next day and told her he could change the beneficiary using the online account. (Id. at ¶ 23.) Donna instructed Willock to use the online account to change the beneficiary designation. (Id.) Upon returning home from the nursing home on September 15, 2010, Willock accessed Donna's online account and named himself the beneficiary of Donna's life insurance policy. (Id.) Donna did not tell Logsdon that she authorized Willock to change the life insurance beneficiary to himself. (Logsdon Aff. ¶ 19.) Logsdon contests the validity of these statements and their admissibility.

Donna passed away on November 6, 2010. (Id.) At the time of her death, the value of her MetLife benefits was approximately $550,000. (Compl. ¶ 13.) On November 22, 2010, Logsdon contacted MetLife and learned for the first time that the beneficiary designation had been changed to Willock on September 15, 2010, using Donna's online account. (Compl. Ex. E, Letter to MetLife dated Nov. 24, 2010.) By letter, the lawyer for Donna's estate notified MetLife that the estate believed the September 15, 2010, beneficiary designation was fraudulently procured and that Logsdon, as the trustee of the irrevocable life insurance trust, was the proper beneficiary. (Id.) On December 8, 2010, Willock submitted a statement of claim for the life insurance benefits. (Compl. ¶ 15.)

Thereafter, MetLife filed this interpleader action on April 22, 2011, contending that there were competing claims to the life insurance benefits, and questions of law and fact which it could not decide without exposing the plan to double liability. (Id. at ¶¶ 19-20.) MetLife has requested that the Court determine who the rightful beneficiary is, so that it may pay that entity the life insurance benefits. (Id. at ¶ 21.) After both Defendants answered the complaint, Logsdon filed this motion for summary judgment.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by " showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

## III. DISCUSSION

Logsdon has moved for summary judgment contending that there is no genuine dispute of material fact that Willock's change of beneficiary was an unauthorized forgery and is invalid. Willock has replied contending that he named himself the beneficiary of Donna's life insurance policy with her knowledge and consent and at her direction.  He argues, in the alternative, that

because he still maintained a valid POA and was Donna's attorney-in-fact, that he was authorized to change the beneficiary without her knowledge or consent.

Logsdon contends that there is no admissible evidence that the September 15, 2010, change of beneficiary was done with the consent and knowledge and at the direction of Donna. Willock admits that he made the changes to Donna's life insurance policy, but contends that he did so at Donna's request. The only evidence supporting Willock's position is found in his own affidavit. Willock states that Donna "informed [him] that she wished to designate him as the beneficiary of her life insurance and instructed him to obtain from MetLife the form necessary to change the beneficiary designation on her life insurance." (Willock Aff. ¶ 21.) Willock further states that Donna "directed [him] to take the appropriate steps to change her beneficiary to him online." (Id. at ¶ 23.) Logsdon contends that these statements are inadmissible hearsay. Willock does not dispute that the statements are hearsay, but he contends that they are admissible under F.R.E. 803(3), 804(3), or 807.

Rule 803(3) provides that "statement[s] of a declarant's then existing state of mind (such as motive, intent, or plan)" are not excluded on the basis of hearsay. Fed. R. Evid. 803(3). The Court assumes that Willock is arguing that Donna's statements evidence the intent to change the beneficiary of her life insurance, which was later accomplished by Willock using the MetLife online account. The MetLife policy is clear that any changes to the beneficiary must be signed by the insured, Donna. (Compl. Ex. A, Summary Plan Description 21, 33.) As Willock has admitted that Donna did not sign the change of beneficiary form, but that he did so at her direction, the change can only be deemed legitimate if it meets the substantial compliance doctrine. See Swedish Match N. Amer., Inc. v. Tucker, 2010 WL 2721875, *3-4 (W.D. Ky. July 8, 2010). This doctrine, in effect,

6

requires that the insured do all that she could have reasonably done to meet the conditions of the policy.  See Life Ins. Co. of N. Am. v. Leeson, 81 F. App'x 521, 523-24 (6th Cir. 2003); Aetna Life Ins. Co. v. Weatherford, 924 F.2d 1057, at *5 (6th Cir. 1991) (table decision).

Willock's affidavit recounting Donna's statements would be evidence of her intent and subsequent actions to substantially comply with the terms of the MetLife policy in changing her beneficiary designation to Willock.  However, using declarations of intent to prove subsequent conduct requires more than just the statement itself.  2 McCormick On Evid. § 275 (6th ed.).

> The matter of the admissibility of declarations of state of mind to prove subsequent conduct is a far different question from that of the sufficiency of these statements, standing alone, to support a finding that the conduct occurred. In the typical case, it is reasonable to hold that the declarations are themselves insufficient to support the finding and therefore that **statements of intention must be admitted in corroboration of other evidence to show the acts**.

Id.  (internal citations omitted) (emphasis added).

The subsequent conduct at issue, which must be shown for Willock to succeed, is that Donna substantially complied with the terms of the MetLife policy in making her final beneficiary designation on September 15, 2010.  However, there is no evidence whatsoever to corroborate the claim that Donna substantially complied with the terms of the policy.  The sole evidence that Willock relies upon are Donna's alleged statements that she wanted Willock to be the beneficiary. Following the alleged statements, Willock admits that he logged onto the MetLife website, filled out the online change of beneficiary form, and electronically signed Donna's signature.  Willock is using these hearsay statements, standing alone, to demonstrate that after making them, Donna substantially complied with the terms of the policy.

However, rather than corroborate Willock's position, the evidence of record demonstrates exactly the opposite.  Donna had made plans to remove Willock's control over her assets, making

only a beneficiary of one out of three established trusts.  She changed her POA from Willock to Logsdon, she created an irrevocable life insurance trust, to be funded by the MetLife policy at issue, and she complained of neglect and emotional abuse at the hands of Willock just days prior to the September 15, 2010, change.  Furthermore, she attempted, on three separate occasions using the paper format, to ensure that the irrevocable trust was the beneficiary of the policy, the last of which occurred only ten days prior to Willock's own change.  There is simply no evidence to corroborate Donna's alleged statements.  The hearsay rule "serve[s] to exclude evidence too unreliable to be evaluated accurately by the trier of fact."  Weinstein's Evid. Manual § 14.01[2] (2011).  It is exactly this type of situation that the hearsay rule seeks to preclude.  The Court finds that the uncorroborated statements are not admissible under F.R.E. 803(3).

Willock next argues that the statements are admissible under F.R.E. 804(b)(3) as a statement against pecuniary interest.  This exception does not apply to the current statements because Donna did not have a pecuniary interest in the benefits of her life insurance policy.  Willock's final argument is that the statements are admissible under the residual hearsay exception found in F.R.E. 807.   However, the first requirement under Rule 807 is that the statement has equivalent circumstantial guarantees of trustworthiness.  As noted in the discussion above, these statements do not have any circumstantial guarantee of trustworthiness.  Therefore, the Court finds that they are not admissible under F.R.E. 807.

Accordingly, the Court finds that the hearsay statements identified by Logsdon are not admissible.  These statements were the sole evidence upon which Willock relied to demonstrate that he named himself the beneficiary of Donna's life insurance policy with her consent and knowledge and at her request.  As they are inadmissible, the Court finds that no reasonable jury could find that

Willock made the changes at Donna's request.  Therefore, the Court finds that Logsdon is entitled to summary judgment on this theory.

Willock next argues that he was authorized to change Donna's life insurance beneficiary, even without Donna's consent, as her attorney-in-fact under the 1995 POA.  Logsdon contends that Willock's POA was not valid on September 15, 2010, and that his actions naming himself as beneficiary were not authorized.  Under Kentucky law, "a power of attorney is a form of agency." Moore v. Scott, 759 S.W.2d 827, 828 (Ky. Ct. App. 1988).  Unless the agency is coupled with an interest, it is revocable at will by the principal.  See id. at 829; Hill v. United Pub. Workers Union of Am., 236 S.W.2d 887, 892 (Ky. 1951); see also 3 Am. Jur. 2d Agency § 41 ("A power of attorney constituting a mere agency may be revoked at any time, with or without cause.").  Furthermore, "no particular formality is necessary to effect the revocation of a power of attorney.  Such revocation may be made directly by the act of the grantor of the power, or may be implied."  3 Am. Jur. 2d Agency § 43.

While the revocation of a power of attorney may occur in a number of methods, "'[a]s between the principal and the agent a revocation of authority does not become effective until it is in some way communicated to the agent.'" United States v. Summit Fidelity & Sur. Co., 408 F.2d 46, 47 (6th Cir. 1969) (quoting 2 C.J.S. Agency § 77b(1)).  However, "[e]xpress notice to the agent that the agency has been revoked . . . is not always necessary, and if the party to be notified actually knows, or has reason to know, facts indicating that the authority has been terminated or is suspended, there is sufficient notice."  3 Am. Jur. 2d Agency § 49.

It is undisputed that Donna executed a POA in 1995 naming Willock as her attorney-in-fact. The 1995 POA was a durable power-of-attorney that had no termination date, and was not coupled

with an interest, making it revocable at will by Donna.  The POA was a general power that granted extensive authority to Willock regarding Donna's economic assets.  The document allowed Willock to draw and sign checks, contracts, and agreements in Donna's name; to vote her shares; to purchase and sell real and personal property in her name; to take on mortgages or liens in her name; to make gifts; and to change the owner or beneficiary of any one of her life insurance policies or retirement plans.  (See Willock Power-of-Attorney.)  This document gave Willock the ability "to do and perform in [Donna's] name all that [she] might individually do."  (Id. at ¶ 15.)

The 1999 POA, naming Logsdon as Donna's attorney-in-fact, has many of the same provisions and grants of authority.  (See Logsdon Power-of-Attorney.)  However, the 1999 POA neither discusses nor expressly revokes the 1995 POA.  Along with the execution of a new POA, Donna also completely changed her estate plans in 1999 to remove her assets from Willock's control.  Donna's new estate plan called for her estate to be divided into a revocable and irrevocable trust, with Logsdon as the Executrix of her will and trustee of the irrevocable trust.  Willock was left only as a partial income beneficiary.  It is undisputed that Donna did not inform Willock of these changes when they occurred in 1999.  The evidence before the Court is that in the summer of 2010, after Donna's condition began to deteriorate, Donna told Willock that she had changed her estate plans to leave her assets to her children rather than Willock.  Willock does not dispute this, rather he claims that he was never informed that his POA had been revoked or that a new POA had been issued.  (Willock Aff. ¶ 3.)

Logsdon contends that when Donna executed her second POA in 1999, naming Logsdon as the attorney-in-fact, that Willock's POA was revoked.  Willock contends that a revocation of agency is not effective unless and until it is communicated to the agent, and that because he was never told

he was no longer the attorney-in-fact, the revocation was not effective.  The first question then becomes whether Donna's issuance of a new POA along with a new estate plan removing the control of her assets from Willock was a revocation of his POA.  The Court finds that there can be no other answer but yes.

While the 1999 POA did not expressly revoke the 1995 POA, it was clearly intended to do so.  The changes to Donna's estate plan in 1999 had the effect of removing Willock's ability to access Donna's assets.  It would make little sense for Donna to change her estate plans removing Willock's control of her assets, if she intended for his 1995 POA to remain intact.  Under the 1995 POA, Willock had access to nearly every single asset that Donna possessed, as well as the ability to change where those assets were going.  It defies logic that Donna would create an irrevocable life insurance trust for the benefit of her children to be funded by her MetLife policy and then leave Willock the ability to change the beneficiary of that policy to himself, making the trust effectively unfunded and worthless.  Rather, it can only be concluded that the 1999 changes, including the new POA, were instituted to remove Willock's power over Donna's assets.  While the 1995 POA was not expressly revoked, the Court finds that Donna's actions demonstrate the intent and implication that the 1995 POA was no longer valid.

The second question the Court must address is when that revocation became effective. Notwithstanding the revocation of the 1995 POA in 1999, that revocation did not become effective until Willock knew, or had reason to know, facts indicating that the authority had been terminated or suspended.  Willock contends that he was never specifically told that his POA was revoked. However, an implied notification can be sufficient notice of revocation.  The evidence is undisputed that Donna told him in the summer of 2010, prior to her hospitalization, that she had changed her

11

will and created trusts leaving her assets to her children, and in the control of Logsdon as trustee, rather than to Willock.  It is further undisputed that Willock is an experienced attorney of over thirty years.

The only power granted to Willock by the 1995 POA was an economic power that allowed Willock to sell or mortgage Donna's real or personal property, access her bank accounts, change her policy beneficiaries, and generally exercise all economic powers that she could exercise. Essentially, the 1995 POA allowed Willock free reign to dispose of the potential assets of Donna's estate however he saw fit.  One who learns that his control over a potential estate has been placed in the hands of a trustee, should likewise know that his power to take that estate's assets for his own has been terminated.  This is especially true when the person at issue is a seasoned attorney.  Under these circumstances, no reasonable  jury could find other than that Willock was aware of facts indicating that his authority to control Donna's assets had been terminated prior to Donna's hospitalization.  Therefore, the Court finds that at the time that Willock exercised his POA on September 15, 2010, there had been an effective revocation of that power, of which Willock had notice.  Accordingly, Willock's use of the power was invalid, and the Court finds that Logsdon is entitled to summary judgment on Willock's power-of-attorney theory.

There being no other theory of recovery raised by Willock, the Court finds that the September 15, 2010, beneficiary designation is invalid.  The beneficiary designation on file prior to the September 15, 2010, designation is Jann Logsdon as Trustee of the Donna Willock Irrevcoable Trust.  Accordingly, the Court finds that Logsdon is the proper beneficiary and grants her summary judgment.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Jann B. Logsdon's Motion for Summary Judgment [DN 16] is **GRANTED**.

cc: counsel of record